UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

BENJAMIN J. WECKERT,                           CIVIL NO. 13-750 (MJD/JSM)

     Plaintiff,

v.                                             <u>REPORT AND RECOMMENDATION</u>

CAROLYN COLVIN,
*Acting Commissioner of Social Security*,

     Defendant.

JANIE S. MAYERON, United States Magistrate Judge.

     This matter is before this Court on the parties' cross motions for summary judgment [Docket Nos. 14 and 19]. Plaintiff Benjamin J. Weckert is represented by Frank W. Levin, Esq. The Commissioner is represented by Ann M. Bildtsen, Assistant United States Attorney. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

     For the reasons discussed below, it is recommended that Plaintiff's Motion for Summary Judgment [Docket No. 14] be DENIED and Defendant's Motion for Summary Judgment [Docket No. 19] be GRANTED.

## I.    PROCEDURAL BACKGROUND

     Plaintiff Benjamin J. Weckert ("Weckert") filed an application for DIB on May 25, 2010. (Tr. 136-42). He alleged disability beginning October 30, 2001, when he was 26 years old. (Tr. 136). Weckert claimed he is disabled by multiple sclerosis and depression. (Tr. 167). The Social Security Administration ("SSA") initially denied

Weckert's application on June 3, 2010, and then denied his application upon reconsideration on July 22, 2010.   (Tr. 89-94, 95-98).   Weckert requested an administrative hearing, and the administrative hearing was held on October 26, 2011, before Administrative Law Judge ("ALJ") Roger W. Thomas.   (Tr. 29-81).   On November 2, 2011, the ALJ issued a decision denying disability benefits.   (Tr. 13-28). Weckert filed a request for review of the ALJ's decision with the Appeals Council. (Tr. 10-12).  The Appeals Council denied Weckert's request for review (Tr. 1-6), making the ALJ's findings the final decision of the defendant.  See 42 U.S.C. § 405(g).

Weckert sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g).  [Docket No. 1].  The Court now has before it Plaintiff's Motion for Summary Judgment [Docket No. 14] and Defendant's Motion for Summary Judgment [Docket No. 19].

## II.   PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  The SSA shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).  The impairment must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 423(d)(1)(A); see also 20 C.F.R. § 404.1509.

A.    **Administrative Law Judge's Five-Step Analysis**

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. § 404.907-09.  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  42 U.S.C. § 405(b)(1); 20 C.F.R. § 404.929.  To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's impairment, residual functional capacity, age, education and work experience.  See 20 C.F.R. § 404.1520(a)(4); see also Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003) (citation omitted).

B.    **Appeals Council Review**

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. § 404.967-404.982.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal

District Court within sixty days after notice of the Appeals Council's action.  42 U.S.C. § 405(g); 20 C.F.R. § 404.981.

   C.   **Judicial Review**

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The Court's review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008).  "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole."  Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).  "Substantial evidence is less than a preponderance, but is

enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. § 404.1512(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

## III.   DECISION UNDER REVIEW

The ALJ made the following determinations under the five-step disability evaluation process. At step one, the ALJ concluded that Weckert last met the insured status requirements of the Social Security Act on December 30, 2006, and he had not engaged in substantial gainful activity from his onset date of October 30, 2001 through his date last insured. (Tr. 18). At step two, the ALJ found that Weckert had the

5

following severe impairment:   multiple sclerosis ("MS") with blurred vision, slurred speech and right hand tremor.  (Id.).  At step three, the ALJ found that Weckert did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 19).

At step four, the ALJ determined that Weckert had the following residual functional capacity ("RFC"):

> the claimant had the residual functional capacity to perform sedentary work  as defined in 20 CFR 404.1567(a) except no ropes, climbing, or balancing; occasional manipulation with the right hand (such as keyboarding); no work requiring good depth perception and no work environments with temperatures higher than 90 degrees F.

(Id.).

In making this determination, the ALJ indicated that he considered all of Weckert's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence.  (Id.).  The ALJ further indicated that he considered the credibility of Weckert's description of the intensity, persistence and limiting effects of his symptoms that were not otherwise substantiated by objective medical evidence.  (Tr. 20).

The ALJ considered Weckert's testimony that he was laid off in 2001 and then provided childcare for his two sons.  (Id.).  The ALJ also considered the testimony of Weckert's wife that prior to the date last insured, Weckert's medications and injections made him worse, causing flu-like symptoms for three to four days per week, and that Weckert had balance and vision difficulties before the date last insured.  (Id.).

The ALJ found Weckert's subjective complaints were not fully credible due to inconsistencies in the record.  (Tr. 20-22).   The ALJ found the objective medical evidence and Weckert's course of treatment did not support limitations beyond those in

6

the RFC finding.  (Tr. 20).  In support, the ALJ explained that when Weckert was diagnosed with MS in October 2001, his symptoms were blurred vision, slurred speech, and hand tremor.  (Id.).  The MRI of Weckert's brain in October 2003 confirmed the MS diagnosis.  (Id.).  Weckert had slightly reduced vision in the left eye and a mild tremor. (Id.).  He was started on Copaxone,[1] and less than a year later, the repeat of the MRI showed stability.  (Id.).  Weckert said his symptoms came and went, but there was nothing that caused significant disability.  (Tr. 21).  Weckert was a stay-at-home father at that time.  (Id.).

Weckert did not return for follow up for almost a year, November 2004.  (Id.).  He had stopped his medications one year ago, despite his doctor's recommendation to the contrary.  (Id.).  In February 2005, he returned for follow-up and reported that he felt good using nutritional supplements for treatment.  (Id.).  He still had a hand tremor, but the MRI showed that his MS was stable.  (Id.).  In December 2005, Weckert underwent occupational therapy for his hand tremor.  (Id.).  His symptoms reduced but he was frustrated with his hand tremor.  (Id.).

Weckert did not return for follow-up until October 2007, nearly one year after his date last insured.  (Id.).  He had been off medications for years.  (Id.).

Based on the evidence prior to the date last insured, the ALJ found Weckert could have performed competitive work within the RFC finding.  (Id.).  The ALJ placed significant weight on Dr. Andrew Steiner's independent expert testimony at the hearing, adopting his opinion of Weckert's RFC.  (Id.).  He noted Dr. Steiner was a specialist in

---

[1]     Copaxone, given by injection, is indicated for reduction of the frequency or relapses in patients with relapsing, remitting multiple sclerosis.  *Physician's Desk Reference* ("PDR") 3221-22 (59th ed. 2005).

physical medicine and rehabilitation, he had the opportunity to review all of Weckert's medical records in the file, his opinion was consistent with the "weight of the objective findings," and he had specialized knowledge of assessing disability.  (Id.).

The ALJ gave some weight to the state agency medical consultants' opinions, but further limited Weckert's RFC based on crediting some of Weckert's subjective complaints.  (Id.).  The ALJ found Weckert's wife's testimony was sincere but gave "greater weight to the overall medical evidence of record. . ."  (Id.).

The ALJ also found that Weckert's allegation of disability was not fully credible because the objective evidence did not support the level of severity he alleged – his daily activities were not as limited as one would expect of a disabled person, he provided childcare to his two young sons, started a handyman business, and admitted certain abilities consistent with the RFC finding.  (Tr. 22).  The ALJ considered Weckert's work history and found it was consistent with competitive full time employment for a number of years.  (Id.).  However, the ALJ did not find that Weckert's good work history supported disability, absent objective evidence of disabling symptoms.  (Id.).

At step four of the disability evaluation, the ALJ found that Weckert was unable to perform his past relevant work through the date last insured.  (Id.).  At the fifth step, the ALJ relied on the VE's testimony that Weckert could perform the occupations of information clerk, cuff folder, and referral and information aide, jobs that existed in significant numbers in the national economy.  (Tr. 22).  Thus, the ALJ concluded that Weckert was not under a disability, as defined in the Social Security Act, from October 30, 2001 through December 30, 2006, the date last insured.  (Id.).

## IV.     THE RECORD

Weckert's only challenge to the ALJ's decision is that the ALJ erred by failing to include fatigue in the RFC finding and the hypothetical question to the vocational expert. Therefore, the Court addresses Weckert's other MS symptoms only as background.

### A.     Medical Evidence Before the Date Last Insured

In August 2001, Weckert had an MRI of his brain to evaluate symptoms of blurred vision, difficulty writing and intermittent slurred speech. (Tr. 257-58). The MRI findings were most consistent with a demyelinating disease.[2] Two months later, Weckert underwent a work-up for MS, including a spinal tap. (Tr. 223). The record does not contain the results of the spinal tap or any conclusions drawn from it. (Tr. 258). Weckert had a repeat brain MRI on March 6, 2002, and there was some increased signal from the previous scan, but the assessment was that he had MS that was fairly stable since August 2001. (Tr. 255).

Weckert was referred by his primary care physician for evaluation by Dr. John Worley at Park Nicollet Clinic on October 27, 2003. (Tr. 248-49). Weckert reported his initial symptoms had been loss of vision in the left eye, feeling "spaced out", and clumsy handwriting. (Tr. 248). Dr. Worley noted Weckert was a stay-at-home father, and he was taking Copaxone and a supplement. (Id.). He further noted "[Weckert] has had continued multiple symptoms which seem to come and go, but nothing which has caused any significant disability." (Id.). On examination, Weckert had a postural tremor

---

[2]     Demyelinating disease is a generic term for a group of diseases of unknown cause, in which there is excessive loss of myelin in the central nervous system, as in multiple sclerosis and Schilder disease. *Stedman's Medical Dictionary* ("*Stedman's*") 513 (27th ed. 2000).

but no other findings.  (Tr. 249).  Weckert's next brain MRI, on November 10, 2003, again showed stable MS since the previous study.  (Tr. 252-53).

Approximately one year later, on November 14, 2004, Weckert told Dr. Worley he had stopped taking Copaxone and was instead taking "a program of antioxidants." (Tr. 244-45).  Weckert stated he felt a lot better and less fatigued.  (Tr. 244).  However, he had his first migraine headache recently and was still having trouble with his handwriting.  (Id.).  On examination, Weckert had a dystonic right hand tremor, and Dr. Worley prescribed occupational therapy.  (Id.).  Dr. Worley also strongly recommended that Weckert take one of the proven immunomodulating drugs for treatment of MS.  (Id.).  On December 7, 2004, the MRI of Weckert's brain was unchanged overall from the previous study.  (Tr. 227-28).  The following week, Weckert started occupational therapy for his hand tremor but as of February 21, 2005, therapy was unsuccessful, and Weckert proceeded to write with his non-dominant left hand. (Tr. 235).

Weckert saw Dr. Worley again on February 8, 2005, reporting he was taking nonprescription nutritional supplements to treat his MS, and he was feeling good. (Tr. 246).  Apart from hand tremor, there were no objective findings on examination, and Weckert's MS was stable.  (Id.).  Nonetheless, Dr. Worley formally recommended treatment with immunomodulating therapy "over the long haul."  (Id.).

### B.   Medical Evidence After the Date Last Insured

Weckert did not follow up with Dr. Worley again for two-and-a-half years. (Tr. 242-43).  On October 24, 2007, Weckert complained of blurred vision in the left eye, tremor, dizziness and fatigue.  (Tr. 242).  Dr. Worley noted Weckert had been off Copaxone for years.  (Id.).  He advised that immunomodulating treatment would offer

10

Weckert a 35-40% chance of stabilizing his MS.  (Id.).  He also prescribed a short course of methylprednisolone to treat Weckert's eye symptoms.  (Id.).  Weckert felt much better after the steroid treatment.  (Tr. 241).  His brain MRI showed mild progression since the 2004 study, with several areas of increased signal in the white matter but no obviously enhancing lesions.  (Id.).  On November 14, 2007, Weckert's physical examination was normal.  (Id.).

On June 3, 2008, Weckert underwent a consultation with Dr. David Webster at the Minneapolis Clinic of Neurology for a second opinion regarding his MS.  (Tr. 299-301).  Weckert said he had gone downhill since he stopped taking Copaxone two years after he was diagnosed with MS in 2001.  (Tr. 299).  He had increased tremors in his right hand, increased visual problems and increased difficulty with cognition.  (Id.).  Dr. Webster wrote, "he is having no trouble with fatigue," but he also wrote, "his chief complaints at this point are fatigueability, cognitive dysfunction, and right hand tremor." (Tr. 299, 301).  Weckert was having chronic daily headaches and imbalance that was worse in the afternoon.  (Tr. 299).  He also had numbness in the left face, arm, and leg. (Id.).  He was irritable and frustrated, and his wife questioned whether he was depressed.  (Id.).  Dr. Webster noted Weckert had been an engineer but was laid off around the time he was diagnosed with MS.  (Id.).  Weckert managed a couple rental properties and was a stay-at-home father.  (Id.).

On mental status examination, Weckert's language function was intact, but his thought process and speech were a little slow.  (Tr. 300).  Dr. Webster agreed with the MS diagnosis, noting Weckert's symptoms and MRI findings were "pretty classic." (Tr. 301).  Dr. Webster requested a formal neuropsychometric evaluation and prescribed amitriptyline for headaches.  (Id.).  Weckert would continue treating with

Rebif.[3]   (Id.).   Dr. Webster noted, "[t]he most difficult question is whether or not he should be considered disabled.   In my experience, determining disability in MS is a difficult task.   We will wait for the neuropsychometric report . . ."   (Id.).

On June 26, 2008, Weckert underwent neuropsychometric testing with Dr. Steven Morgan at the Minneapolis Clinic of Neurology.   (Tr. 302-05).   Dr. Morgan noted that two months earlier Weckert had complained of tremor, slurred speech, fatigue, imbalance, aches and pains, depression, blurred vision, black spots, feeling rundown, headaches, irritability and jerky eye movements.   (Tr. 302).   Weckert's wife described considerable variability in Weckert's memory, and she expressed concern that he was mildly depressed.   (Id.).

Dr. Morgan noted that Weckert had completed high school and technical school. (Id.).   He had worked in a technical field doing testing, assembly and troubleshooting for seven years.   (Id.).   He was laid off in 2001.   (Id.).   Early on after his layoff, he did some work on the side, rehabilitating houses.   (Id.).   Weckert largely functioned as a house husband with sons who were six and five years old.   (Id.).

The testing documented areas of decline.   (Tr. 304).   The deficits in Weckert's test results were of mild to moderate degree across measures of processing speed, complex attentional function, and learning and memory efficiency.   (Id.).   He also showed some early decline in aspects of higher-level executive function, and mild-moderate impairment of fine motor dexterity with his right hand.   (Id.).   Emotionally,

---

[3]     Rebif is indicated for treatment of relapsing forms of MS to decrease the frequency of exacerbations and delay the accumulation of physical disability.   *PDR* at 2623.

testing indicated some dissatisfaction and dysphoria, but not enough to be considered clinically depressed. (Id.).

Dr. Webster noted the findings were consistent with cognitive disorder secondary to a history of MS of mild to moderate severity. (Id.). He opined:

> [i]n combination with his physical limitations, this is an individual who would be expected to require vocational rehabilitative assistance in order to identify a possible viable work niche in consideration of his idiosyncratic pattern of strengths and weaknesses. Given the disproportionate importance of new learning efficiency, attentional function, and speed of processing to maintenance of employment, it would be difficult to be optimistic regarding capacity for competitive employment in areas commensurate with his educational background.

(Id.).

Weckert followed up with Dr. Webster on July 14, 2008. (Tr. 297-98). He had begun treatment with Rebif, but it made him tired. (Tr. 297). Dr. Webster noted Weckert was considering applying for Social Security disability benefits, but he was able to function at home and perform his activities of daily living. (Id.). In a review of systems, Weckert complained of right arm tremor interfering with his handwriting and other coordinated activities, poor memory, fatigues easily, and mild dysarthria[4] and dysphagia.[5] (Id.). He was not tripping and falling, but he had to walk carefully. (Id.).

On mental status examination, Weckert was alert, with intact language function. (Id.). His affect was flat, and his thoughts and speech were slow. (Id.). His immediate recall was normal, he remembered two out of three objects after five minutes, his long

---

[4] Dysarthria is a disturbance of speech due to emotional distress, brain injury, or to paralysis, incoordination, or spasticity of the muscles used for speaking. *Stedman's* at 550.

[5] Dysphagia is difficulty swallowing. Id. at 554.

term memory was good, his fund of knowledge was normal, he performed arithmetic slowly but accurately, he had no delusions or hallucinations, no apraxia,[6] and his gait was slow but unremarkable.  (Id.).  Dr. Webster encouraged Weckert to remain as physically and intellectually active as possible.  (Id.).

On October 29, 2008, Weckert reported having flu-like symptoms when he took Rebif twice a week.  (Tr. 295-96).  The symptoms started five or six hours after he took the medication and lasted five or six hours.  (Id.).  Dr. Webster recommended taking the medication so that most of the symptoms would occur while Weckert was sleeping. (Id.).  Weckert reported no new neurological symptoms, and no exacerbations since the past Spring.  (Id.).  Dr. Webster noted Weckert was applying for disability based on significant cognitive dysfunction, but he was functioning okay at home.  (Id.).

On December 4, 2008, Weckert saw his primary care physician, Dr. Jonathon Ray at Park Nicollet Clinic, for health maintenance and completion of a disability insurance form.  (Tr. 239-40).  Dr. Ray completed the form, but when asked, as a general matter, whether Weckert qualified for disability, Dr. Ray said he was not sure but there were deficits in his "neuropsych exam."  (Tr. 239).

Several months later, on April 3, 2009, Weckert followed up with Dr. Webster. (Tr. 293).  Weckert's leg pain, numbness and blurred vision had improved somewhat with steroid treatment, and his sleep had improved slightly with nortriptyline.  (Id.).  He had been on Rebif and Copaxone for one-and-a-half years with no severe exacerbations of MS symptoms.  (Tr. 294).  Weckert's wife believed his cognition was slowly deteriorating, particularly when he was fatigued.  (Tr. 293).  He was also more irritable and more forgetful when fatigued.  (Id.).  She was concerned whether the kids

---

[6]     Apraxia is a disorder of voluntary movement.  Id. at 117

were safe at home alone with her husband.  (Id.).  Weckert scored 35/38 on a mental status examination.  (Tr. 294).  Dr. Webster ordered a brain MRI, and the findings of the MRI on April 6, 2009 were not significantly changed since October 30, 2007.  (Tr. 294, 250).  About a week later, Weckert complained that both of his eyes were a little blurry, and he felt his cognitive function was deteriorating.  (Tr. 291-92).  Dr. Ray referred Weckert for a MS subspecialty evaluation.  (Tr. 292).

On June 12, 2009, Weckert was evaluated by Dr. Jonathan Calkwood at the Schapiro Center for Multiple Sclerosis.  (Tr. 289-90).  Weckert said he was not working due to his cognitive dysfunction.  (Tr. 289).  Dr. Calkwood noted Weckert was staying home raising his children, which "presented some issues as well."  (Id.).  Loud noises distracted and bothered Weckert quite a bit.  (Id.).  Weckert's physical functioning was relatively normal, apart from "some balance problems," "some issues with fatigue," "some dyesthetic pain" and intermittent changes in vision.  (Id.).  Dr. Calkwood concluded:

> A comprehensive neurologic examination is documented in the electronic medical record and reveals Ben to be alert and fully oriented with some obvious cognitive problems, mild apraxia seen on examination.
>
> ***
>
> In summary, we have a gentleman with primarily a cognitive form of MS.  I was able to review recent cranial nerve MRI scans and no spinal cord imaging has been obtained to date. The cranial MRIs revealed evidence of enlarged third ventricle without substantial atrophy.  There is moderate burden of disease compared to an MRI from 2004, a slight increase in burden of disease, which is less than expected given the worsening of his cognitive functioning.  He is having other symptoms of paresthesias and dysesthesias that are brief in duration and not bothersome, but more worrisome to him in terms of what they represent.  They do not need treatment or management.  I reassured the patient

> that these are normal given the involvement from his multiple sclerosis. . . . I am quite concerned about this young man's cognitive form of multiple sclerosis.  He has a moderate burden of disease, but cognition problems out of proportion to this.  I believe we need to be aggressive with this treatment due to the potential for major problems with his cognitive functioning in the future.

(Tr. 290).

Weckert underwent repeat neuropsychological testing with Dr. Morgan on July 13, 2009.  (Tr. 365-68).  The testing did not clearly document an interval decline in cognitive dysfunction since the previous year.  (Tr. 366).  The principle change was that there were now more evident depressive symptoms.  (Id.).  Weckert's cognitive deficits would affect his ability to manage his psychiatric factors.  (Tr. 367).  Dr. Morgan suggested that occupational therapy might help bolster Weckert's compensatory techniques.  (Id.).

Weckert saw Marie Sherwood, a physiologist at the Minneapolis Clinic of Neurology, for a therapeutic exercise intake.  (Tr. 361-62).[7]  Weckert reported symptoms of poor short term memory, poor reflexes, heat sensitivity, right side numbness in his leg, some blurred vision in the left eye, good energy in the morning but fatigue in the afternoon, occasional low back pain, major headaches accompanying back pain, and tremors in his right hand.  (Tr. 361).  Weckert rated the severity of his fatigue, on average, as five on a scale of one to ten.  (Id.).  He found it hard to fall asleep and hard to wake up.  (Id.).  He napped three or four times a week for twenty to thirty minutes.  (Id.).  He could not keep up with his kids, who were eight and six years old.  (Id.).

---

[7]     The date of treatment is missing from the medical record, but it indicates Weckert was 34-years-old.  Weckert turned 34-years-old on May 23, 2009.

Weckert followed up at the Schapiro Center for Multiple Sclerosis on August 5, 2009.  (Tr. 278-86).[8]  Weckert reported increasing problems with cognition and denied depression.  (Tr. 278).  He complained of slurred speech when tired, extremity pain, blurred vision in the left eye, and difficulty focusing with head movement.  (Tr. 278-79).  At his next visit on September 15, 2009, Weckert reported "crashing" in the afternoons due to fatigue.  (Tr. 406-07).  Rest periods did not prevent him from crashing.  (Tr. 407).  It was recommended that Weckert take a 38-45 minute nap at 1:00 p.m. or a rest period with no stimulation.  (Tr. 411).

Weckert was given some samples of Provigil[9] for treatment of his fatigue in December 2009.  (Tr. 388-89).  On December 17, 2009, Dr. Jonathan Ray reviewed Weckert's laboratory findings and discussed Weckert's fatigue with him.  (Tr. 509-10).  His lab tests showed normal testosterone and TSH indicated some anemia.  (Tr. 509).  Noting that a significant iron deficiency could cause fatigue, Dr. Ray ordered additional testing.  (Tr. 510).  In March 2009, Weckert had a mild iron deficiency anemia, which likely would not account for his fatigue.  (Tr. 507.)  Weckert was taking Copaxone, which had a 22% chance of causing asthenia,[10] and Lexapro,[11] which had a 2-8% chance of causing fatigue.  (Id.).  On the MRI dated April 22, 2010, there were no changes from

---

[8]  Follow-Up Visit Forms from the Schapiro Center for Multiple Sclerosis do not indicate the treating provider's name but Weckert was first seen at Schapiro by Dr. Jonathan Calkwood.

[9]  Provigil is used to promote wakefulness in patients with excessive sleepiness. *PDR* at 1131-32.

[10]  Asthenia is weakness or debility. *Stedman's* at 158.

[11]  Lexapro is indicated for the treatment of major depressive disorder.  *PDR* at 1282.

his previous brain MRI.  (Tr. 363).  On August 31, 2010, Weckert said he still felt tired, although he was taking Nuvigil.[12]  (Tr. 459-67, 475-79).  That day, an MRI of his brain indicated moderate and stable lesions, mild generalized atrophy, and moderate callosal body thinning without progression.  (Tr. 445-46).

On September 10, 2010, Weckert underwent another neuropsychological evaluation with Dr. Webster.  (Tr. 481-82).  Weckert continued to serve as a house husband, and he had limited demands associated with property management. (Tr. 481).  Weckert took his children to school in the morning and paid bills or shopped while they were gone.  (Id.).  He believed he had suffered a decline in his higher level cognitive skills.  (Id.).  His wife questioned whether he should drive or watch his children alone.  (Id.).  The neuropsychological test results were generally comparable to his prior testing, but there was significant interval decline in performance on a test of fine motor dexterity.  (Tr. 482).  Weckert's depression level was unchanged despite treatment. (Id.).  Weckert actually improved on some tests, but this was likely due to "practice effects."  (Id.).

In November 2010, Weckert's migraine headaches were better, but his imbalance and left leg weakness increased.  (Tr. 453-54).  In physical therapy several months later, Weckert reported having fallen several times, and that he felt tired after exercise.  (Tr. 444).  At the Schapiro Center for Multiple Sclerosis on January 25, 2011, Weckert reported recently breaking his fibia and wrist when he fell.  (Tr. 447).  He was

---

[12]     Nuvigil decreases extreme sleepiness due to narcolepsy and other sleep disorders.    Drugs   &   Medications   -Nuvigil   oral,   available   at http://www.webmd.com/drugs/drug-152275-
Nuvigil+Oral.aspx?drugid=152275&drugname=Nuvigil+Oral

no longer doing any work, and he took naps throughout the day. (Tr. 448). He was irritable and noises "set him off." (Id.). His mood was up and down. (Id.).

On October 20, 2011, Nurse Practitioner Jacqueline Higgins from the office of Dr. Calkwood completed a Medical Source Statement in support of Weckert's Social Security disability application. (Tr. 522-23). She indicated that they started seeing Weckert in June 2009. (Tr. 522). Higgins indicated that she agreed with statements about MS that were reproduced on the form from various treatises. (Tr. 522). She agreed that fatigue, frequently accompanied by weakness to the point of exhaustion, is present at some time in most MS patients; fatigue is often inexplicable on the basis of neurological findings; and fatigue may occur in patients who have normal or only minimally abnormal examinations. (Id.). Higgins also checked the following boxes on the form: (1) Weckert's fatigue was not the product of malingering or somatization; (2) his complaints of fatigue were typical of MS patients; (3) his fatigue would likely interfere with unskilled, low stress, sedentary work; and (4) he would likely need unscheduled and extra breaks each day, specifically, two one-hour breaks in addition to the typical lunch break and fifteen minute breaks in the morning and afternoon. (Tr. 523).

### C.   State Agency Physician Opinions

Upon initial review of Weckert's application for Social Security disability benefits on May 28, 2010, Dr. Angela House, a state agency consulting physician, reviewed Weckert's medical records and completed a Physical Residual Functional Capacity Assessment form upon request of the SSA. (Tr. 348-55). She opined that Weckert, as of his date last insured, could occasionally lift fifty pounds and frequently lift twenty-five pounds; stand and/or walk or sit six hours each in an eight-hour day; never climb

ladders, ropes or scaffolds; frequently climb ramps and stairs, balance, stoop, kneel, crouch or crawl; he should avoid frequently fingering with the right and/or handling any dangerous or spillable substances with the right hand; and avoid concentrated exposure to temperature extremes, humidity, and all dangerous machinery and unprotected heights. (Tr. 348-52). On the same day, a state agency consulting psychologist, Dr. R. Owen Nelsen, reviewed Weckert's medical records for the SSA and completed a Psychiatric Review Technique Form. (Tr. 334-47). He concluded there was insufficient evidence of mental impairments to assess the severity of any mental health impairments before Weckert's date last insured. (Tr. 346).

On July 21, 2010, Dr. Charles Grant reviewed Weckert's Social Security disability file upon reconsideration of his disability application, and he affirmed Dr. House's opinion. (Tr. 423-25). Dr. Ray Conroe also reviewed Weckert's file on July 21, 2010, and he concluded Weckert did not have a medically determinable mental impairment as of December 31, 2006. (Tr. 426-39).

### D.   Administrative Hearing

Weckert and his wife testified at an administrative hearing before the ALJ on October 26, 2011. (Tr. 29). The ALJ began the hearing by explaining that Weckert's date last insured was December 30, 2006, which meant he had to demonstrate disability on or before that date and up to the present time. (Tr. 33). Weckert testified that he is married and has two sons. (Tr. 39-40). His oldest child was about ten years old, and his younger son was about eight years-old. (Tr. 40-41). Weckert stayed home and cared for his children while his wife was at work, but he had help over the summers for the last three or four years. (Tr. 41).

Weckert testified that he is right-handed, but he writes with his left hand.  (Tr. 37-39).  When he is tired or the temperature is hot, his tremor is worse.  (Tr. 38-39).  He had a driver's license and continued to drive in the mornings but not in the afternoons because he was too tired.  (Tr. 42).  Heat was a factor that made Weckert's symptoms worse, including slurred speech, poor vision and fatigue.  (Tr. 42-43).  Weckert started Copaxone treatment when he was first diagnosed with MS but then went off it due to side effects.  (Tr. 51).  He tried Rebif, but he felt like he had the flu every time he had an injection, every two or three days.  (Id.).  He tried Copaxone again for more than a year but asked for a different medication because he did not feel it was helping him.  (Tr. 52).  Now, he was being treated with monthly infusions.  (Id.).

Weckert had a college degree.  (Tr. 45).  His last job ended due to a company slow-down.  (Id.).  He did not look for other work, because his MS symptoms interfered with working a full day.  (Tr. 52-53).  He was laid off about the time his son was born. (Tr. 67). He cared for his baby and had to take long naps.  (Tr. 53).  Weckert also managed two homes that he rented, but he needed help.  (Tr. 57-58).  His wife now did all the work.  (Tr. 58).

Weckert could sit for 40 to 60 minutes, stand 15 to 20 minutes, walk 30 minutes, and lift over 50 pounds.  (Tr. 54-56).  However, he could not engage in these activities all day long, one day after another.  (Tr. 56).  This was true at the time his job ended in 2001.  (Id.).  He had been having trouble with his work performance because he was tired.  (Id.).  He believed his job performance contributed to his lay-off.  (Tr. 57). Weckert would rather have worked than stay home.  (Id.).

Weckert described his fatigue.  (Tr. 58-59).  It was not like the fatigue he felt after playing a football game when he was in high school.  (Tr. 59).  The fatigue felt like a big

21

weight smashing down on him, and it was always there.  (Id.).  If affected him physically and mentally.  (Id.).  Things like showering and shaving now took him a lot longer than they did in the past.  (Tr. 60).  Weckert could not think of any full time job he could have performed by the end of 2005, because he would have fallen asleep on the job.  (Tr. 61-62).  He napped once or twice a day for fifteen minutes to an hour, whenever he needed.  (Tr. 79).  At least once or twice a month, he did not feel well enough to get out of bed.  (Tr. 79-80).  Other days, he could function in the morning for a maximum of four hours.  (Tr. 80).

Kimberly Weckert then testified.  (Tr. 62).  At times, her husband could not see out of his left eye at all.  (Tr. 63).  His right eye was also affected when he was overheated or exhausted.  (Id.).  He sometimes had blind spots where he could not see the side of his face.  (Id.).  He has been falling down due to poor balance since 2001, although more frequently now.  (Id.).  She said he was too stubborn to use a cane.  (Tr. 65).

When Weckert was laid off, he was concerned about his ability to work full time, so he started a handyman business.  (Id.).  He had trouble completing jobs in a "normal" amount of time.  (Id.).  He was not getting enough business, but his symptoms also prevented him from working as much as he wanted.  (Tr. 66).  The business lasted less than a year.  (Id.).  Weckert's wife felt he did not have stamina, and she did not believe he could perform a job where he was sitting all day.  (Tr. 68).  He had to nap at least an hour or two "in order to be functional enough to be a part of the family."  (Tr. 69).  He did not make a deliberate decision to be a stay-at-home dad; he would have preferred to continue working.  (Id.).

Dr. Andrew Steiner testified as an independent medical expert at the administrative hearing. (Tr. 70). He reviewed the record and found that Weckert was diagnosed with relapsing, remitting MS, with symptoms of imbalance, fatigue, blurred vision, right hand tremor and diminished cognition. (Tr. 70). Weckert had fallen and fractured bones. (Id.). Imaging studies showed lesions consistent with MS, and the lesions were stable over time. (Id.). Examinations of Weckert's coordination, gait and eye examinations did not show "a great deal of deficit." (Id.). Weckert's cognitive functioning was studied and showed moderate decrease in processing speed, moderate decrease in complex attention, and moderate decrease in working memory. (Tr. 71). He had a mild slowing of fine motor abilities. (Id.). Weckert's MS was not of listing level severity because examinations did not show "a great deal of abnormality." (Id.).

Based on the record, Dr. Steiner opined Weckert would have a sedentary residual functional capacity due to balance problems, with no climbing or balancing, and occasional fine manipulation on the right. (Tr. 71-72). Weckert would also have difficulty with activities requiring good depth perception, and with heat at greater than ninety degrees. (Tr. 72). Dr. Steiner did not address cognitive deficits because it was not his area of expertise. (Id.).

On examination by Weckert's counsel, Dr. Steiner agreed that Copaxone and Rebif are used to slow the progress of MS, not to treat symptoms such as fatigue. (Tr. 73). The tremor in Weckert's right hand was present by February 2005. (Id.). In the case of MS, a tremor might increase with fatigue. (Id.). Dr. Steiner did not believe there was any correlation between the imaging studies and the report of symptoms. (Tr. 74). However, the nature of Weckert's complaints was consistent with the diagnosis of MS. (Id.). There was no way to objectively measure the severity of fatigue;

it was a credibility issue.  (Tr. 74-75).  Dr. Steiner declined to make a credibility judgment.  (Tr. 75).

Kenneth Ogren[13] testified at the administrative hearing as a vocational expert. (Tr. 75).  The ALJ told Ogren to assume an individual in the age range of 26 to 35 years old, who had 16 years of education, and past work as in Ogren's report.  (Tr. 76).  The ALJ asked Ogren to further assume the individual had the work limitations described by Dr. Steiner, and questioned whether such a person could perform any of Weckert's past work.  (Tr. 76-77).  Ogren testified that he could not.  (Tr. 77).  He further testified that Weckert had transferable skills of reading technical manuals and knowledge of tools. (Id.).   Ogren testified that such an individual could perform other jobs, such as information clerk,[14] cuff folder,[15] and referral and information aide.[16]

The ALJ posed another hypothetical question, adding to the first hypothetical the restriction that the person would have moderate cognitive decline, limiting him to simple, unskilled tasks, essentially routine and repetitive, and, at most, three to four step tasks. (Tr. 78).  Ogren testified the jobs of cuff folder and referral aide could be performed by such a person.  (Id.).

---

[13]   The correct spelling of the vocational expert's name is taken from the written Vocational Consultant Case Analysis.  (Tr. 208).

[14]   Dictionary of Occupational Titles ("DOT") Code 237.367-046, providing 5,500 jobs in Minnesota.   (Tr. 78).   Dictionary of Occupational Titles, available at http://www.occupationalinfo.org/

[15]   DOT Code 685.687-014, providing 5,200 jobs in Minnesota.  (Id.).

[16]   DOT Code 237.367-042, providing 2,800 jobs in Minnesota.  (Id.).

In response to questioning by Weckert's counsel, Ogren testified that if a person had two unpredictable days per month when he could not function at all, and this occurred every month, his absence from work would not be tolerated.  (Tr. 80).  If the individual had to nap or rest as often as Weckert testified, he could not perform the jobs Ogren had identified.  (Tr. 80-81).

## V.   SUMMARY OF PARTIES' ARGUMENTS

Weckert did not challenge the ALJ's findings at the first four steps of the disability evaluation process, (Pl's Mem. in Supp. of Mot. for Summ. J. at 12-13 [Doc. No. 15]), except at step four, Weckert asserted the fatigue he suffers prevents him from performing any work eight hours per day, five days per week, and the ALJ's decision to the contrary is not supported by substantial evidence in the record as a whole.  (Id. at 11, 13).  In support, Weckert contended that the ALJ ignored the opinions by his treating specialist, Dr. Calkwood, regarding the role of fatigue in MS, and particularly his opinion that Weckert would need extra, unscheduled breaks during a workday.  (Id. at 13). While the ALJ discussed Weckert's fatigue in the analysis of Listing 11.09 (Tr. 19), Weckert argued the ALJ should have addressed fatigue in his RFC analysis.  (Id. at 14).

Weckert also submitted that the ALJ's credibility analysis of his subjective complaints was selective and superficial.  (Id.).  Weckert claimed it was error for the ALJ to ignore the following facts in the credibility analysis:  (1) he napped while his son napped during the day; (2) his fatigue was always present and felt like a weight was "smashing him down"; and (3) the prescription medications he had declined to take over a period of time were not prescribed to reduce fatigue but to slow the progression of symptoms.  (Id. at 14-15).

25

Lastly, Weckert argued that the ALJ erred by requiring objective evidence of fatigue, because objective evidence indicated that he had MS, which could reasonably be expected to produce fatigue.  (Id. at 15-16).  In sum, Weckert asserted that the ALJ erred by omitting fatigue from his determination of the RFC and from the hypothetical vocational question posed to the VE.  (Id. at 16).  Weckert requested remand to the SSA for further proceedings.  (Id. at 16-17).

The Commissioner responded that the ALJ's decision was supported by substantial evidence, and was based on a thorough review of the entire record, with proper reliance on Dr. Steiner's expert testimony.  (Def's Mem. in Supp. of Mot. for Summ. J. ("Def's Mem.") at 5 [Doc. No. 20]).  The Commissioner noted the Medical Source Statement ("MSS") was not completed by Dr. Calkwood as Weckert contended, it was completed by Nurse Higgins.  (Id.).  In any event, the Commissioner argued the MSS is of little relevance because it did not address Weckert's fatigue during the relevant time period; it was limited to when Weckert began treating with Dr. Calkwood in 2009.  (Id. at 6).  Thus, the ALJ's failure to discuss the MSS was harmless error.  (Id.).

The Commissioner also asserted that the ALJ gave good reasons for finding Weckert's allegation of total disability not credible, including Weckert's ability to care for his two children and start a handyman business after his work layoff, his failure to take prescribed medication, and his gaps in treatment.  (Id. at 6-7).  Finally, the Commissioner claimed that the ALJ did not rely solely on the lack of objective evidence in discounting Weckert's subjective complaints, but the ALJ properly considered the lack of objective evidence as one factor in his determination.  (Id. at 8-9).

In reply, Weckert contended the ALJ failed to consider whether he could perform work other than his past relevant work on a sustained basis for eight hours per day, five

days per week.  (Pl's Reply Mem. ("Reply") 2, Doc. No. 21).  Weckert testified he could not perform any job full time on a long term basis because he needed to take long naps during the day.  (Id.).  Weckert asserted the ALJ erred in discounting this testimony as not credible.  (Id.).  First, Weckert argued severe fatigue could be present in MS without objective findings.  (Id. at 3.)  Second, Weckert argued the fact that the MSS was completed by a nurse, not Dr. Calkwood, was not articulated by the agency, therefore, the court could not rely on this basis to reject the opinion.  (Id.).  Third, his ability to perform sporadic daily activities did not mean he is able to perform full time work.  (Id.). Weckert suggested that evidence of him "feeling good" and "less fatigued" was limited to two instances that may simply have referred to his good days.  (Id. at 4).  Weckert argued Dr. Calkwood's opinion stated that Weckert needed additional, unscheduled breaks during the day and, on average, he would miss more than four days days of work per month, which is more than the two instances relied on by the Commissioner. (Id.).

Fourth, Weckert argued that the Commissioner failed to point to medical evidence that if Weckert had taken prescribed medication, it would have ameliorated his fatigue.  (Id.).  Finally, Weckert contended the ALJ lacked a sufficient basis to reject evidence that Weckert required unscheduled breaks during the day and more than four absences from work per month.  (Id.).  Weckert claimed that by rejecting this evidence, the ALJ improperly drew his own inferences from the medical reports.  (Id. at 4-5).

## VI.   DISCUSSION

To be entitled to benefits, the claimant must prove her disability began before her insurance expired.  Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (quoting Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998)); 42 U.S.C. § 423(c).  "[E]vidence from

outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be awarded.'" Moore v. Astrue, 572 F.3d 520, 525 (8th Cir. 2009) (citing Cox, 471 F.3d at 907) (quoting Pyland, 149 F.3d at 877).

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1).   It is the claimant's burden to prove his or her RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d 777. 779 (8th Cir. 1995)).   In making an RFC determination, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations.   Id.

### A.   Medical Opinions

The ALJ must consider every medical opinion that is received, 20 C.F.R. § 404.1527(c), and resolve the conflicts among the various opinions, rejecting conclusions that are inconsistent with the record as a whole.   Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009).   A treating physician is defined as an "acceptable medical source" under the regulations, and only acceptable medical sources can establish whether a claimant has a medically determinable impairment.   20 C.F.R. § 404.1513(a)(1).   A nurse practitioner is defined as an "other source."   20 C.F.R. § 404.1513(d)(1).   An ALJ "may use evidence from "other sources to show the severity of [the claimant's] impairment(s) and how it affects [his or her] ability to work." 20 C.F.R. § 404.1513(d). Unless the ALJ gives a treating physician's opinion controlling weight pursuant to 20 C.F.R. § 404.1527(c)(2), the ALJ will consider all of the following factors in deciding the weight given to any medical opinion:  (1) examining providers' opinions are generally entitled to more weight than nonexamining sources; (2) generally, more weight is given to opinions of treating sources; (3) the better

explanation a source provides for an opinion, particularly medical signs and laboratory findings, the more weight the opinion will be given; (4) generally, the more consistent an opinion is with the record as a whole, the more weight it will be given; (5) generally, more weight is given to specialists' opinions related to issues within their expertise; and (6) the ALJ will consider any factors brought to his or her attention that supports or contradicts an opinion. 20 C.F.R. § 404.1527(c)(1-6

Here, the ALJ did not discuss the MSS from Dr. Calkwood's office in his decision. (Tr. 13-28). It is, therefore, irrelevant to this Court's decision that the Commissioner, rather than the ALJ, has pointed out the MSS was completed by a nurse, not by Dr. Calkwood. See Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001) ("'A reviewing court may not uphold an agency decision based on reasons not articulated by the agency' when 'the agency [has] fail[ed] to make a necessary determination of fact or policy' upon which the court's alternative basis is premised.") (quoting Healtheast Bethesda Lutheran Hosp. and Rehab. Ctr. v. Shalala, 164 F.3d 415, 418 (8th Cir. 1998) (discussing the limitations on the rule made by the Supreme Court in S.E.C. v. Chenery Corp., 318 U.S. 80, (1943)) (alterations in original). The issue is whether this error was harmless. The Commissioner contended that the ALJ's failure to address the opinion was harmless error because the opinion does not shed much light on Weckert's residual functional capacity before his date last insured of December 30, 2006. (Def's Mem. at 6). For the following reasons, this Court agrees that the ALJ's failure to discuss the MSS was harmless error.

First, the MSS indicates Dr. Calkwood did not begin to treat Weckert until 2009, and the MSS does not describe his condition in 2006. (Tr. 523). Weckert was diagnosed with MS in 2001 (Tr. 523), but his diagnosis alone is not enough to determine

whether his symptoms were of disabling severity.   See e.g. Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997) (although claimant manifested symptoms of MS prior to date last insured, record did not support conclusion that claimant was disabled within the meaning of the listing criteria in the regulations).

Second, having reviewed all of the medical evidence in the record from the period of Weckert's insured status, October 30, 2001 through December 30, 2006, the MSS does not support the opinion expressed in the document that Weckert suffered disabling fatigue prior to the date last insured.   When Weckert was first diagnosed with a demyelinating disease in August 2001, fatigue was not one of his reported symptoms. (Tr. 257-58).   During the relevant period, repeat MRIs of Weckert's brain indicated his MS was stable, rather than progressing.  (Tr. 227-28, 252-53, 255, 257-58).  In October 2003, Weckert said his initial MS symptoms had included loss of vision in the left eye, feeling spaced out, and clumsy handwriting.   (Tr. 248).   In evaluating Weckert on October 27, 2003, Dr. Worley wrote, "[Weckert] has had continued multiple symptoms which seem to come and go, but nothing which has caused any significant disability." (Id.).

In November 2004, Weckert told Dr. Worley, in the context of his taking a nutritional supplement instead of the prescription medication Copaxone, that he felt a lot better and less fatigued.  (Tr. 244).  While this suggested that Weckert suffered some fatigue during the relevant period, possibly as a side effect of Copaxone, it does not support the opinion of Weckert's RFC in the MSS.   At Weckert's last visit with Dr. Worley during the relevant time period, in February 2005, Weckert reported that he was feeling good, and Dr. Worley concluded that Weckert's MS was stable.  (Tr. 246). Weckert then had occupational therapy for his hand tremor in December 2005.

(Tr. 235).   Weckert did not seek treatment again for almost two-and-a-half years, October 2007, which was one year after his date last insured.  (Tr. 242).  This paucity of treatment is inconsistent with his allegation of disabling fatigue.  In sum, the opinion in the MSS did not address the relevant time period and was inconsistent with the medical evidence existing in that period.  Therefore, the ALJ's failure to discuss the opinion was harmless error.  See Bye v. Astrue, 687 F.3d 913, 917 (8th Cir. 2012) (to show an error is harmless, the claimant must "provide some indication that the ALJ would have decided differently if the error had not occurred.")

### B.   Credibility

An ALJ may not rely solely on the lack of objective medical evidence in evaluating the credibility of a claimant's subjective complaints.  Halverson v. Astrue, 600 F.3d 922, 931-32 (8th Cir. 2010).  "Once the diagnosis is established, but the severity of the degenerative condition during the relevant period is unanswered, the claimant may fill the evidentiary gap with lay testimony."  Grebenick, 121 F.3d at 1199 (citing Basinger v. Heckler, 725 F.3d 1166, 1169 (8th Cir. 1984)).  The ALJ must consider the claimant's prior work history; daily activities; duration, frequency and intensity of symptoms; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions.  Halverson, 600 F.3d at 931 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1989)).  "[T]he ALJ's credibility determination of the lay witnesses becomes critical, because the ALJ is, of course, free to believe or disbelieve any or all of the lay witnesses."  Grebenick, 121 F.3d at 1199.  "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination."  Halverson, 600 F.3d at 932 (quoting Juszczyk, 542 F.3d 626, 632 (8th Cir. 2008)).

The ALJ is required to acknowledge the Polaski factors but does not have to methodically discuss each factor.   Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). The record indicates that the ALJ did not reject Weckert's allegation of fatigue solely based on lack of objective medical evidence.   The ALJ acknowledged the Polaski factors, (Tr. 20), and specifically addressed Weckert's course of treatment (Tr. 20-21), daily activities, work history, and the absence of supporting objective evidence (Tr. 22).

While it would have been preferable for the ALJ to explicitly discuss why the evidence of fatigue in the medical records after 2006 did not relate to Weckert's condition during the relevant time period, the ALJ's credibility finding is, nonetheless, supported by substantial evidence in the record as a whole.   In discounting Weckert's credibility, the ALJ relied primarily on Weckert's ability to provide care for his two young sons and start a handyman business after he was laid off his job in 2001.   (Id.).   An ALJ may discount a claimant's credibility based on his or her ability to care for children.   See Young v. Apfel, 221 F.3d 1065, 1068-69 (8th Cir. 2000) (ability to work as homemaker and primary caretaker of two small children in combination with lack of objective medical evidence supported negative credibility determination).

The ALJ also discussed Weckert's course of treatment and concluded that the "claimant would have been able to work competitively within parameters of the residual functional capacity" prior to the date last insured.   (Tr. 20-21). The ALJ noted, without specifically discounting Weckert's credibility as a result, that Weckert had been off his medications "for years" as of October 2007.   (Id.).   The record indicates Weckert did not seek treatment for fatigue between August 2001 and December 2005, and he sought no treatment at all from December 2005 through October 2007.   In October 2003, Dr. Worley stated Weckert did not have any symptoms that "caused any significant

32

disability." (Tr. 248). Weckert's only mention of fatigue before 2007 was that after he stopped taking Copaxone and started treating with a nutritional supplement, he felt better and less fatigued. (Tr. 244). In February 2005, Weckert reiterated that he was feeling good on the nutritional supplement. (Tr. 246).

The fact that Weckert stated he felt good off his medications in 2004 and 2005, and then did not seek treatment until October 2007, supports the ALJ's credibility analysis. See Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000) (failure to seek treatment for two years and failure to follow prescribed course of remedial treatment were grounds for denying benefits). The record is consistent with a conclusion that Weckert's fatigue became an issue after his insured status expired because he sought frequent treatment and evaluation for fatigue after October 2007. See Turpin v. Colvin, -- F.3d – 2014 WL 1797396 (8th Cir. May 7, 2014) (evidence that claimant's health worsened in subsequent years did not demonstrate disability during time period relevant to claim). For these reasons, this Court concludes the ALJ properly discounted Weckert's credibility and was not required to further reduce Weckert's RFC based on fatigue, Weckert's only challenge to the RFC finding.

### C. Vocational Expert Testimony in Response to Hypothetical Question

"The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006) (quoting Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994)). The ALJ's RFC finding is supported by substantial evidence in the record as a whole, as discussed above. Therefore, the ALJ did not err in relying on the VE's testimony, in response to a hypothetical question containing the RFC finding. See Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005)

("ALJ properly included only those limitations supported by the record as a whole in the hypothetical).  The ALJ's decision is affirmed.

## VII.    RECOMMENDATION

For the reasons set forth above,

IT IS RECOMMENDED THAT:

1.      Plaintiff's Motion for Summary Judgment [Docket No. 14] be DENIED; and

2.      Defendant's Motion for Summary Judgment [Docket No. 19] be GRANTED.

Dated:        June 18, 2014

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge


NOTICE

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 2, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.